## INDEX TO APPENDIX

Transcript Excerpt: Complete Testimony of Officer Eisenstein ............................................. A1

Argument on Motion ..................................................................................... A31

Trial Court's Memorandum of Decision ..................................................... A37

Transcript Excerpt: T8-27-98 (page 1) Finding of Probable Cause at Arraignment ................... A49

Transcript Excerpt: T4-1-99 Defense Counsel's Mention of Terry v. Ohio ............................. A50

Transcript Excerpt: T4-1-99 State's Concession at Trial that Defendant's
    "Mere Flight" was Not a Crime .......................................................... A51

### CONNECTICUT PRACTICE BOOK

Conn. Prac. Bk. §37-12 .................................................................................. A52

Case 3:03-cv-00676-WWE   Document 9-2   Filed 01/22/2004   Page 2 of 32

1        something that's looked at very lightly and also

2        the mobility of drugs or narcotics that are to be

3        in that car, isn't something that should be

4        overlooked.  The Carroll exception allows the

5        police officer when the object of the search,

6        where the actual object to be found can be picked

7        up and taken, allows the police officer less

8        deference to go in and sees the narcotics on the

9        premises, those narcotics can be taken up and

10       transported to other places.  Also the car can be

11       transported to other places.  The notion they have

12       to sit there and go get a warrant signed before

13       they can enter the motor vehicle is incorrect.

14            Now, whether there is reasonable articulable

15       suspicion to enter that car or to see that

16       criminal activities was afoot in this situation

17       becomes clear.  The plain purpose or the fact that

18       when police officers went and attempted to talk to

19       and effectuate an arrest on Mr. Smith, his mere

20       flight is not a crime until the struggle ensued,

21       which is an interfering with an officer, a crime

22       had occurred at that time.  The flight, the

23       struggle is a crime.  It's interfering by

24       statute.  By definition it is a crime.

25            I know counsel did remark whether or not

26       there was a voluntary statement to enter the car.

27       The police are not required to have a voluntary

A51

# CONNECTICUT PRACTICE BOOK

**Conn. Prac. Bk. §37-12. Defendant in Custody; Determination of Probable Cause**

If a defendant has been arrested without a warrant and has not been released from custody by the time of the arraignment or is not released at the arraignment pursuant to Section 38-4, the judicial authority shall, unless waived by the defendant, make an independent determination as to whether there is probable cause for believing that the offense charged has been committed by the defendant. Unless such a defendant is released sooner, such probable cause determination shall be made no later than forty-eight hours following defendant's arrest. Such determination shall be made in a nonadversary proceeding, which may be ex parte based on affidavits. If no such probable cause is found, the judicial authority shall release the defendant from custody.

**TRANSCRIPT EXCERPT: COMPLETE TESTIMONY OF**
**OFFICER EISENSTEIN**

38

1       affiliation.

2               OFFICER EISENSTEIN:  Larry Eisenstein.  I'm a

3       member of the Stamford Police Department,

4       Stamford, Connecticut.

5               THE COURT:   All right.  Good morning,

6       Officer.

7               OFFICER EISENSTEIN:  Good morning, Your

8       Honor.

9               THE COURT:  Before you're asked any

10      questions, if either of the attorneys should ask

11      you a question and the other attorney objected to

12      the question, do not answer.  Do you understand?

13              OFFICER EISENSTEIN:  Yes, Your Honor.

14          DIRECT EXAMINATION OF OFFICER EISENSTEIN

15  BY MR. COULOUTE:

16      Q    Good morning, officer.  How long have you been

17  with the Stamford Police Department?

18      A    Twenty years.

19      Q    What type of training and experience have you

20  undergone in twenty years, briefly?

21      A    I'm a graduate of the Connecticut State Police

22  Academy and Municipal Training Counsel.  I have

23  attended numerous schools and seminars in relation

24  to laws of arrest and search and seizure including

25  the Arnold Markle State's Attorney School, to the

26  Drug Enforcement Administrative School of

27  Narcotics Enforcement.  Also attended other

1    seminars related to narcotics surveillance and

2    organized crime and other activities such as that.

3        Q    Specifically, within the Stamford Police Force,

4    are you assigned to a certain unit, sir?

5        A    Yes, I am.

6        Q    What unit is that?

7        A    I'm assigned to the Narcotics and Organized Crime

8    Unit.

9        Q    How long have you been with them, sir?

10       A    Ten years.

11       Q    And what basically did you do as part of that

12   unit?

13       A    I'm an investigator.  My duties include but are

14   not limited to the investigation of narcotic

15   activity within the city of Stamford, Connecticut.

16       Q    You have been doing that for ten years?

17       A    Yes.

18       Q    Now, within your ten years there have you had the

19   occasion to work with informants, sir?

20       A    Yes.

21       Q    Basically, what is that interplay like, sir?

22       A    What we do is we have people that either we arrest

23   or people who come to us and offer their services as an

24   informant and what we do is we interview these people as to

25   what cases and information they have for us that they can

26   assist us in investigating, and then we explain to them how

27   we want them to either make buys, observe drug activity on

A2

1    the streets or introduce undercover officers, things of that

2    nature.

3         Q    Are some informants deemed better than other

4    informants?

5         A    Yes.

6         Q    Why is that?

7         A    An informant's reliability and credibility is

8    determined by first of all the type of information he gives

9    and what we're able to corroborate and how many cases a

10   person has done.  The more cases they had where they're

11   proved to be reliable, the more reliable they are.

12        Q    And approximately how many different informants do

13   you work with, is there a set number?

14        A    Well, we have --   it varies from different times.

15   I may be working with as many as a dozen different

16   informants at a given time or maybe working with one or two,

17   just depends on what our circumstances are like at the

18   time.  But presently, I have approximately ten different

19   informants that I work with on a regular basis.

20        Q    You always act on information the informants give

21   you?

22        A    Well, what we do is we try to corroborate their

23   information and through our own investigation and wherever

24   that investigation leads us that's where we go that

25   determines how and how much we act.

26        Q    Let me direct your attention to Wednesday,

27   August 26, were you on duty?

A3

```
 1      A    August 26, '98.

 2      Q    1998, yes, sir.

 3      A    Yes, I was.

 4      Q    Were you with the Narcotics Division?

 5      A    Yes.

 6      Q    Now, did you receive a call from an informant that

 7   day?

 8      A    Yes, I did.

 9      Q    What was the substance of that conversation?

10      A    The informant stated to me that there was a

11   vehicle parked in the parking lot of 186 Greenwich

12   Avenue, which is a one story facility owned and operated by

13   the city of Stamford considered to be public housing,

14   and it's primarily inhabited by senior citizens.   He said

15   that this vehicle was parked in the parking lot.   The

16   informant described the vehicle as being an old Cutlass,

17   color gray, two door with a blue vinyl roof with a

18   Connecticut plate on the back of the vehicle 679 "M" as in

19   Michael, "B" as in boy, "X" as in x-ray.

20      Q    Let's regress just briefly.   The informant that

21   contacted you had you worked with the informant in

22   the past?

23      A    Yes.

24      Q    You know the informant to be credible?

25      A    Yes.

26      Q    What are you basing that upon?

27      A    I have been working with this informant since 1990
```

A4

42

1    and the informant had done --   recently he had been

2    reliable, proven reliable, on over ten occasions, over the

3    overall relationship that I have had with this informant.

4    This informant has been reliable approximately thirty times.

5         Q    If you could continue.  What other information did

6    the informant give you that day?

7         A    Stated inside this vehicle was an unspecific

8    quantity of crack cocaine and that the vehicle was being

9    operated by a black male, approximately 6 feet tall over 200

10   pounds, muscular build, beard and mustache, wearing a black

11   tee shirt, blue jeans and white sneakers.

12                THE COURT:   Could you stop a second because

13                I missed that.  Would you read it back?

14                (Whereupon, the reporter read back the last

15                answer.)

16                THE COURT:   Continue Mr. Couloute.

17   BY MR. COULOUTE:

18        Q    If you recall, did he give any other description

19   of the correct vehicle or occupants there if you

20   recall anything else?

21        A    No, the complete description of the male was

22   given, the complete description including the vehicle plate

23   was given, only other information relative to this was that

24   this male was in the company of a black female who the CI

25   referred to as Marlene.

26        Q    Now, do you know how the CI came in possession of

27   this information, sir?

A5

1    A    Yes.

2    Q    Can you tell us, please.

3    A    The CI had overheard a conversation between

4    Marlene and the black male subject prior to them

5    leaving the area to go get the quantity of crack.

6    Q    After you received the information what did you

7    do, sir?

8    A    Myself, Officer Doug Robinson and Wayne Skitara,

9    all members of my unit, went into the area of 186 Greenwich

10   Avenue and set up a surveillance of the parking lot.  We

11   observed the vehicle parked in the lot, backed into a

12   parking space on the property of 186 Greenwich Avenue and

13   from two different angles we surveyed the vehicle.

14   Q    Now, the vehicle that you're mentioning is the one

15   that the CI told you would be there?

16   A    Yes.

17   Q    Is there anything different about the actual --

18   or your actual observations of the vehicle that

19   was different from the CI?

20   A    No, everything was exactly the way the CI said

21   where it would be.

22   Q    What happened in the course of your surveillance?

23   A    During the course of surveillance I observed the

24   black male later identified by us as Emanuel Smith

25   approach the vehicle on the driver's side with

26   keys in his right hand, opened up the driver's

27   side door of the two door vehicle and leaned into

44

1    the vehicle down on the floor near the driver's

2    side in the front.   He was there a few seconds,

3    rose back up, closed the door and locked the

4    vehicle.  At which time we approached Emanual

5    Smith and he began to run towards the area of

6    Polasky Street.

7        Q    When you say "leaned down in the vehicle" could

8    you be more --   could you be more descriptive if

9    you could?

10       A    He opened up the door of the car.

11       Q    Yes, sir.

12       A    He stepped between the door of the car and body of

13   the car and where the front steering wheel is,

14   front seat on the driver's side of the vehicle, he

15   leaned down from his waste and slightly bent his

16   knees and leaned down toward the floor, the

17   driver's side floor of the vehicle.

18       Q    Okay.   What happened after that, sir?

19       A    When we approached the subject he began to run

20   towards Polasky Street at which time Officer Skitari pursued

21   him on foot, myself and Officer Robinson pursued him in our

22   surveillance vehicle.  He attempted to go towards --   there

23   is a bridge which runs over the Rippawon River.  He

24   attempted to cross that bridge.  We cut him off with the

25   vehicle.  He made a right-hand turn and ran into --   there

26   is a very large construction yard there.  It's a cement     -

27   company 0 & G Cement Company.  He ran into the yard and he

A7

1    cut through some debris and wound up along a fenced in area

2    right near the river.

3        Q    Approximately how many feet away from the car was

4    the defendant when you finally apprehended him,

5    sir?

6        A    I would say approximately a hundred feet.

7        Q    What happened at that time?

8                THE COURT:    A hundred feet from what,

9    Mr. Couloute?

10               MR. COULOUTE:    From the actual vehicle.

11           From the vehicle.

12               THE COURT:    Thank you.

13   BY MR. COULOUTE:

14       Q    What happened at that time, sir?

15       A    We caught up with Emanuel Smith.  He fought with

16   us briefly.  We were able to wrestle him to the

17   ground and place him in handcuffs.

18       Q    What occurred next?

19       A    Officer Skitari took his --   the car keys which

20   were still in his right hand.  He gave them to me.  We all

21   walked back to the vehicle and I opened up the driver's side

22   door.  I leaned across the vehicle and opened up the

23   passenger side door to allow Officer Skitari to enter the

24   vehicle from the passenger side.  Officer Robinson remained

25   with the prisoner and called for a uniformed car to come

26   secure the prisoner.  I leaned down in the same area where

27   we had observed Emanuel Smith lean down in the vehicle on

1    the floor of the front passenger side.  I lifted up the

2    floor matt.  Underneath the floor matt was a celephane

3    wrapper from a cigarette pack and inside that was eleven

4    small yellow tinted plastic ziplock bags, which contained

5    what I know from my training and experience to resemble

6    crack cocaine.

7        Q    The drugs, narcotics were found on what side of

8    the car?

9        A    Yes, found underneath the driver's side floor matt

10   in front of the vehicle.

11       Q    Okay.  What happened next, sir?

12       A    We completed a search of the vehicle.  We found

13   two other items inside.  Officer Skitari found two items one

14   on the passenger seat which was a receipt with the name

15   Emanuel Smith.  On the inside of the glove box was a bank

16   book with his name on it and we then secured the vehicle,

17   our prisoner requested to go to the hospital for a small

18   laceration on his forehead and he said he was diabetic and

19   needed attention for that.  He said his blood sugar was

20   irregular.  We had him transported to the hospital by a

21   uniformed officer and he was then brought to headquarters,

22   booked and placed in a cell.

23       Q    Just two more questions, sir.  The physical

24   description given by the CI of the individual who

25   would be in possession of that car, was there

26   anything inaccurate about that description?

27       A    No, everything the CI stated to us it matched the

47

1    suspect exactly the way I described him.

2        Q    And at what point did you recognize this

3    individual, the individual that was at the car as

4    Emanuel Smith?

5        A    When he began to run --   When I observed and

6    recognized him as Emanuel Smith was when I cut him off on

7    Polasky Street because at that time he was in front of the

8    vehicle and that was the first real good look that I had

9    with him face to face.  Officer Skitari recognized him when

10   he was --   when he caught up with him in O & G property.

11       Q    How did you know Emanuel Smith?

12       A    I knew him from previous narcotics arrests.

13           MR. COULOUTE:  The state has no further

14           questions, Your Honor.

15           THE COURT:  All right.  Mr. Marantz?

16       CROSS-EXAMINATION OF OFFICER EISENSTEIN

17   BY MR. MARANTZ:

18       Q    Attorney Eisenstein, did you have a chance to

19   review your report before coming in today?

20       A    Yes.

21       Q    When was that?

22       A    When did I review the report?

23       Q    Yes.

24       A    Approximately between nine-thirty and ten o'clock.

25       Q    Okay.

26           THE COURT:  That's today, right?

27           OFFICER EISENSTEIN:  Yes.

1    BY MR. MARANTZ:

2        Q    Did you discuss your testimony with anyone today?

3        A    I didn't discuss my testimony with anyone, no.

4        Q    Now, was it you yourself who dealt with the

5    confidential informant directly?

6        A    Yes.

7        Q    Were you also designated as the team leader as far

8    as this arrest?  What is that the course of

9    practice?

10       A    Well, we don't --   in this particular case being

11    that we didn't have a supervisor present with us,

12    we don't have anybody that's designated as being

13    an actual team leader or supervisor.   We kind of

14    rule by committee.

15       Q    Okay.   You have explained that the CI was

16    reliable in the past, I heard your testimony.

17    What I'm curious to know, when was the very last

18    time you did use the CI?

19       A    Approximately I would say within two to three

20    weeks prior to this particular case we had used

21    him.

22       Q    And did that result in a successful arrest as

23    well?

24       A    Yes.

25       Q    Can you tell me in the case of a CI of this nature

26    is this a person whose been arrested by your department in

27    the past or is this a citizen forthcoming with information

1    for the police?

2               MR. COULOUTE:   Objection.  Relevance.

3               THE COURT:   Overruled.

4               THE COURT:   You can answer the question.

5               OFFICER EISENSTEIN:  This is a person whose

6         been arrested by the Stamford Police Department in

7         the past, yes.

8    BY MR. MARANTZ:

9       Q   Does he have anything pending at this point?

10      A   Yes, he does.

11      Q   Would I be correct in assuming that anybody who

12   wants to act as a CI there would be something in

13   it for him?

14             MR. COULOUTE:   Objection.

15             THE COURT:   That's obvious.  Sustained.

16         Those answers clearly answer that question.

17         Mr. Marantz, move along here to the veracity basis

18           of knowledge.

19    BY MR. MARANTZ:

20      Q   Do you know --   personally know whether the CI

21   may have had a grudge to hold against my client?

22      A   I can say that my CI did not know your client.

23      Q   He clearly --   he did know the passenger

24   Ms. Marlene Smith.   Do you know what his prior relationship

25  was with Ms. Smith?

26      A   Yes.

27      Q   Could you tell us?

50

1       A    Their acquaintances by virtue of the fact that

2   they hang out in the same social circle.

3       Q    When the CI gave you this information regarding

4   Ms. Smith and Mr. Emanuel Smith together did he

5   indicate whether anybody else was in the car or

6   with the defendant at anytime?

7       A    The informant stated that the vehicle was being

8   driven by Emanuel --  by a black male subject that he

9   described that we later identified as Emanuel Smith and the

10  only other person in contact with the vehicle was Marlene

11  Smith.

12      Q    And throughout your observations of the vehicle

13  nobody else approached the car, is that correct?

14      A    That's correct.

15      Q    About how long did you conduct surveillance on the

16  vehicle before making --  before moving in on the

17  defendant?

18      A    Approximately fifteen minutes.

19      Q    And the first activity that you viewed was

20  Mr. Smith approaching the car?

21      A    That's the only activity.

22      Q    Now, the confidential informant had also stated to

23  you that Marlene had drugs, is that correct?

24      A    That's correct.

25      Q    Tell us a little more precisely what was

26  indicated?

27      A    It was indicated there was narcotics in the

A13

51

1   vehicle and that additional narcotics was in the

2   possession of Marlene Smith.

3       Q    Were any drugs ever recovered from Marlene Smith?

4       A    No.

5       Q    Now, do you know how the CI knew Marlene had drugs

6   on her person?

7       A    Yes.

8       Q    Would you tell us?

9       A    This was through the conversations that the CI

10  overheard between Marlene Smith and Emanuel Smith.

11      Q    Did --   do you know if the CI ever actually saw

12  any drugs on Marlene Smith or Emanuel B. Smith, Jr.?

13      A    I know that he did not see drugs in the vehicle

14  because the CI never approached the vehicle and the CI was

15  never in the vehicle.

16      Q    Do you know if he saw Marlene Smith handling any

17  drugs?

18      A    No.

19      Q    Do you know if the confidential informant in fact

20  sold the defendant any drugs?

21      A    The confidential informant does not sell drugs.

22      Q    How do you know that?

23      A    Because any drugs that would be in the possession

24  of the confidential informant would probably be

25  used by the confidencial informant, they're a drug

26  user not a drug dealer.

27      Q    So the confidential informant you had indicated

A14

56

1              OFFICER EISENSTEIN:  No, not at that

2              particular moment.

3      BY MR. MARANTZ:

4          Q    No reason at that point by his movements.  How did

5      you assess that?

6          A    He wouldn't have seen us because we were in

7      vehicles that he wouldn't have detected as police

8      vehicles.  We were not in police cars.

9          Q    Unmarked vehicles?

10         A    In unmarked vehicles.

11         Q    Also in plain clothes that day?

12         A    Yes.

13         Q    And when you apprehended Mr. Smith, did you find

14     any drugs whatsoever on his person?

15         A    No.

16         Q    Do you have an opinion as to what he might have

17     been doing reaching into the car and getting up

18     and getting out locking the door?

19         A    Do I have an opinion?

20         Q    Yes.

21         A    Well, I would say that there are a couple

22     different things he could have been doing.   One

23     of which would have been to check to see if the

24     drugs were still there.   Number two, to rearrange

25     their location in the vehicle or Number three, to

26     place them in the vehicle had he had them on his

27     person.

1  Q Did the CI advise you that there were drugs in the

2 car prior to it being parked in front of 186 Greenwich

3 Avenue?

4  A The CI wording was that there is a vehicle parked

5 at this location.  The CI described the vehicle

6 and stated this, there was an unspecified amount

7 of crack cocaine inside the vehicle.

8  Q And this was based on a conversation he overheard?

9  A Yes.

10  Q You know whose car?

11  A Yes.

12  Q Could you tell us?

13  A The registered owner of the vehicle is Acordia

14 Andrea Dozier.

15  Q When did you discover that information?

16  A When we checked the registration of the vehicle.

17  Q Was that during your surveillance?  Was that post

18 arrest?

19  A We had run the license plate and during the

20 surveillance and then we had checked the

21 registration inside the vehicle when we searched

22 it.

23  Q You said also that there was a surveillance of the

24 parking lot from two angles?

25  A Yes.

26  Q Could you just give us a brief rundown on how that

27 was set up?

54

1    one of the apartments and did not come out of the

2    apartment until after Emanuel Smith was

3    apprehended.  If she did, assuming she did have

4    narcotics in her possession at any time, according

5    to my informant she had ample opportunity to

6    dispose of any narcotics in her possession.

7         Q    You would be surprised at this point?

8         A    That would be speculation on my part.

9         Q    You know what apartment she went into?

10        A    I don't recall the number of the apartment that

11   she was in.  I do recall the location of the

12   apartment however.

13        Q    At no time did you ever search that apartment, is

14   that correct?

15        A    We did not have a reason, you know, no probable

16   cause, and we didn't have a warrant to search,

17   therefore, we didn't.

18        Q    Wasn't reason enough to your confidential --

19   wouldn't reason enough be in an attempt to corroborate the

20   confidential informant's information and in fact show that

21   he was reliable?

22        A    By doing what, searching the apartment?

23        Q    Yes.

24        A    No, because we had no probable cause to search the

25   apartment, and we had no warrant to search the apartment, so

26   how can we search the apartment.  Wouldn't be a legal

27   search.  My corroboration of information given by the

1    informant, we had already corroborated the information.

2    Everything that the informant told us up to that point was

3    proven true.

4        Q    Well, how did you corroborate that information?

5        A    The information given to us was to describe the

6    vehicle we observed, the exact vehicle described to us, to

7    describe --  he described the subject.   We observed that

8    exact suspect as described.   The movement of the suspect

9    running from us upon observing us.   His actual apprehension

10   and search of the vehicle shows that everything that the CI

11   told us was true.

12       Q    And you also indicated that you saw the defendant

13   reach into the car and look under the seat, is

14   that correct?

15       A    What I said was that he opened up the door of the

16   vehicle and leaned down on the front driver's side of the

17   vehicle, down near where I searched, in that vicinity, the

18   front floor matt, that's where he appeared to be looking and

19   that's where he appeared to be reaching.   He made no

20   movement to reach under the seat as best that I could see.

21       Q    But at that point where he was reaching into the

22   vehicle and reaching down, do you think that he was aware

23   of the officer's presence?

24              MR. COULOUTE:   Objection.   Calls for

25              speculation.

26              THE COURT:   He can answer.   He already said,

27              no.   What was the rest?

A18

1    has cases pending.   Are those Possession of

2    Narcotics cases?

3         A     There is one Possession of Narcotics case.

4         Q     Does the confidential informant have Sale of

5    Narcotics cases pending?

6         A     Never.   Not now, not ever.

7         Q     The CI had stated that Marlene Smith had some

8    drugs on her person, is that correct?

9         A     Yes.

10        Q     Which officer conducted the search on Ms. Smith at

11   the scene?

12        A     We called a female uniformed officer to the scene

13   Jennifer Pinto.

14        Q     And in fact is it correct that she did not recover

15   any drugs from the person of Marlene Smith?

16        A     That's correct.

17        Q     So the confidential informant's information that

18   there were drugs on Marlene Smith's person was incorrect?

19                    MR. COULOUTE:   Objection.   The issue

20               Officer Eisenstein wouldn't know if there were any

21               drugs on Marlene Smith until there was a search.

22               We have to realize the officer chasing

23               Emanuel Smith at that time had plenty of

24               opportunity if she was watching Emanuel Smith

25               dispose of drugs in the house before they actually

26               went back to where Ms. Smith was.                -

27               Officer Eisenstein would be speculating at best to

1    say whether or not there were drugs on her person.

2    He answered the question at the time she was

3    searched there were no drugs on her person subject

4    to arrest of Mr. Smith.

5        MR. MARANTZ:  I didn't hear any testimony

6    regarding Ms. Smith entering any house or loss

7    of --   losing sight of Ms. Smith.

8        MR. COULOUTE:  Maybe the foundation should

9    be laid or asked where Ms. Smith was at the time.

10   We know she wasn't at the car.  Officer Eisenstein

11   said Emanuel Smith was the only one at the car.

12       THE COURT:   I'll allow the question to be

13   answered and overrule the objection, Mr. Couloute.

14       MR. COULOUTE:   Yes, sir.

15       OFFICER EISENSTEIN:  Repeat the question.

16       MR. MARANTZ:  Can the court reporter read

17   back the question?

18       THE COURT:   Because if you didn't say it I

19   was going to say it.

20       (Whereupon, the last question was read back

21   by the court reporter.)

22       OFFICER EISENSTEIN:  No, that's not correct.

23   If I can elaborate?

24   BY MR. MARANTZ:

25   Q    Yes.

26   A    I'm saying my informant's information I believe to

27   be correct, okay, that Marlene Smith was inside

A16

58

1      A    Myself and Officer Robinson were in one

2    surveillance vehicle directly across the street

3    from 186 Greenwich Avenue.    We had a clear and unobstructed

4    view of the parking lot and suspect vehicle.

5    Officer Skitari was parked in the area to our right on a

6    small side street, which has also a clear and unobstructed

7    view of the parking lot and the vehicle as well.

8      Q    All the officers were in vehicles?

9      A    Yes.

10      Q    Officer Skitari left his vehicle to pursue the

11    defendant on foot?

12      A    No, he drove his vehicle into the parking lot and

13    then exited his vehicle and pursued the subject on

14    foot there into the parking lot at 186?

15      A    Yes.

16      Q    And do you -- Strike that.  You indicated that

17    the defendant ran approximately 100 feet from

18    where the car was parked, is that correct?

19      A    That's correct.

20      Q    Did you lose sight of him at anytime?

21      A    No.

22      Q    You discovered who the vehicle belonged to after

23    the search of the vehicle when you uncovered the

24    registration, is that what you're testifying?

25      A    When we ran the plate prior to.

26      Q    Ran the plate prior?

27      A    During the surveillance, then we again confirmed

A21

1    that by checking inside the vehicle and finding the

2    registration.

3        Q    Is the owner of the vehicle known to you?

4        A    Yes.

5        Q    Is the owner of the vehicle known to you as

6    someone involved in criminal activities?

7        A    Yes.

8        Q    What sort of criminal activities?

9        A    Assault and most recently this person is presently

10   incarcerated as a suspect in a hit and run homicide.

11       Q    Is the owner of the vehicle also known to you as

12   somebody involved in drug use?

13       A    No.

14       Q    So then what you're indicating, telling us today

15   is that you have never arrested the owner of the vehicle for

16   drugs?

17       A    That's correct.

18       Q    And you've never observed the owner of the vehicle

19   using drugs or selling drugs?

20       A    No because if I did, I would have arrested him.

21       Q    Well, don't officers sometimes make observations

22   without making arrests?

23               MR. COULOUTE:    Objection.  Relevance.

24               THE COURT:    Sustained.

25   BY MR. MARANTZ:

26       Q    At anytime in the recent past have you seen the

27   owner of the vehicle operating that vehicle?

60

1    A    I have never seen the owner of that vehicle

2    operate that vehicle.

3    Q    So you yourself also did question Marlene Smith,

4    is that correct?

5    A    Yes.

6    Q    Did at anytime you ask her where she was going,

7    whether she lived at 186 Greenwich Avenue or anything

8    regarding the visit to 186 Greenwich Avenue?

9    A    Yes.

10    Q    What did she indicate?

11    A    She stated to me that she had seen Emanuel Smith

12    on West Main Street and asked him for a ride over

13    to 186 Greenwich Avenue, and he complied and gave her a ride

14    over to that address.

15    Q    She indicate why she was going there or where she

16    was going?

17    A    Visiting friends in an apartment.

18    Q    Did she indicate whether she was going to get back

19    into the car with Mr. Smith and go elsewhere?

20    A    No, she did not indicate that.

21    Q    Why was she excluded as a suspect in this case?

22         MR. COULOUTE:    Been asked and answered.

23         THE COURT:    I'll let him answer again.

24         OFFICER EISENSTEIN:    The information

25    regarding the vehicle involved Emanuel Smith, and

26    the drugs that were located inside the vehicle

27    were found in an area where we observed that he

A23

61

1            had just been, and no drugs were found in the

2            possession of Marlene Smith.    So, therefore, she

3            was not arrested.

4    BY MR. MARANTZ:

5        Q    When you had set up the surveillance of the

6    vehicle for the fifteen minutes at anytime did you

7    observe any sales by the defendant?

8        A    No.

9        Q    Did you observe anything in his hands?

10       A    Yes.

11       Q    Referring to the keys?

12       A    Yes.

13       Q    But no bags?

14       A    No bags.

15       Q    You have testified that you were in plain clothes

16   and unmarked vehicles.  Did you announce, stop the police

17   when you saw Mr. Smith exit the vehicle?

18       A    When we began --   when we approached him

19   Officer Skitari got out of the car.  He immediately

20   recognized us as police officers and began to run.

21       Q    How do you know he recognized you as police

22   officers?

23       A    Because we have arrested him in the past.  He

24   knows who we are.  We're very recognizable people,

25   not undercover to the point nobody knows who we

26   are.  Probably the most recognized police officers          -

27   in the city of Stamford.

62

1    Q    You have your badges displayed?

2    A    Yes.

3    Q    How were they displayed?

4    A    Mine was displayed by a chain around my neck,

5    displayed in front of my chest.

6    Q    So there were three officers who actually moved in

7    on Mr. Smith or was it just you and Officer Skitari?

8    A    Officer Skitari exited his vehicle and began foot

9    pursuit.  Myself and Officer Robinson pursued him in our

10    vehicle then got out on foot once he entered the O & G

11    property.

12    Q    Did anybody display any weapons?

13    A    No.

14    Q    Not the officer?

15    A    No.

16    Q    Not the defendant?

17    A    No.

18    Q    So it's your testimony that when Mr. Smith saw the

19    officer approaching him he did not stop, he

20    continued to leave the area?

21    A    Yes, he ran from us.

22    Q    And then you and Officer Skitari ran after him?

23         MR. COULOUTE:  Your Honor, excuse me at this

24         time, this is becoming quite repetitive.  He's

25         answered these questions for the third time.  The

26         answer is he drove his car to a point where he

27         parked his car, got on foot and chased the

1          individual down with the other officer.  It's been

2          asked and answered.

3               MR. MARANTZ:   Question withdrawn, Your

4          Honor.

5     BY MR. MARANTZ:

6          Q    Was at the time of the pursuit, were the officers

7     saying anything at all to Mr. Smith?

8          A    When we were chasing him?

9          Q    Uh huh.

10         A    No, we were just chasing him.

11         Q    Was Mr. Smith at any point saying anything to the

12    officers?

13         A    Not while we were chasing him.

14         Q    And when you caught Mr. Smith?

15         Q    Did he have anything to say?

16         A    At the time when we were attempting to take him

17    into custody, no, he didn't have anything to say.

18         Q    You cuffed him in the concrete company's yard?

19         A    Yes.

20         Q    Was he standing?  At that point was he lying face

21    first down on the ground?

22         A    He was in the prone position on his stomach.

23         Q    And at that time did you place him under arrest?

24         A    Absolutely.

25         Q    And you patted him down?

26         A    Searched him.

27         Q    Searched.   And the only items recovered again

72

the veracity

and in the

roboration by the

prong and

police, then,

the probable

search the

Your Honor, that

CI alone and

on.    Mere

probable cause,

je of the

ation by the


sed on the

on't see

rge either.    I

back to this,

dismissed by the


you talking


Intent to Sell,

er the

ice ever

information   -

more than a

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

TRIAL COURT'S MEMORANDUM OF DECISION

CR98012871                              (SUPERIOR COURT
AC19503

STATE OF CONNECTICUT                    (STAMFORD/NORWALK JUDICIAL
                                        (DISTRICT AT STAMFORD
VS

EMANUEL B. SMITH                        MAY 24, 1999

## MEMORANDUM OF DECISION
## RE: DEFENDANT'S MOTION TO DISMISS

The following memorandum of decision is filed with the Appellate in compliance with Practice Book §68-1 and in response to a notice filed by the State of Connecticut-Appellant, pursuant to Practice Book §64-1.

The court incorporates by reference the transcript of its oral decision rendered on April 6, 1999 starting with page 73 at line 23 of the transcript of said decision through page 83 in its entirety.

Additionally, on page 76 at line 22, the word seeing should read seizing. Additionally, and by clarification, the court adds the language "by the defendant with keys in his possession, thereby creating an expectation of privacy to the word locked at page 77 line 1 of said transcript. Finally, at page 79, line 26, the word business should read the word buys.

Signed at Norwalk, this 26 Day of May, 1999.

                                        E Rodriguez J
                                        RODRIGUEZ, J.

98-5291

A37