1    something that's looked at very lightly and also

2    the mobility of drugs or narcotics that are to be

3    in that car, isn't something that should be

4    overlooked.  The Carroll exception allows the

5    police officer when the object of the search,

6    where the actual object to be found can be picked

7    up and taken, allows the police officer less

8    deference to go in and sees the narcotics on the

9    premises, those narcotics can be taken up and

10    transported to other places.  Also the car can be

11    transported to other places.  The notion they have

12    to sit there and go get a warrant signed before

13    they can enter the motor vehicle is incorrect.

14        Now, whether there is reasonable articulable

15    suspicion to enter that car or to see that

16    criminal activities was afoot in this situation

17    becomes clear.  The plain purpose or the fact that

18    when police officers went and attempted to talk to

19    and effectuate an arrest on Mr. Smith, his mere

20    flight is not a crime until the struggle ensued,

21    which is an interfering with an officer, a crime

22    had occurred at that time.  The flight, the

23    struggle is a crime.  It's interfering by

24    statute.  By definition it is a crime.

25        I know counsel did remark whether or not

26    there was a voluntary statement to enter the car.

27    The police are not required to have a voluntary

# CONNECTICUT PRACTICE BOOK

**Conn. Prac. Bk. §37-12. Defendant in Custody; Determination of Probable Cause**

If a defendant has been arrested without a warrant and has not been released from custody by the time of the arraignment or is not released at the arraignment pursuant to Section 38-4, the judicial authority shall, unless waived by the defendant, make an independent determination as to whether there is probable cause for believing that the offense charged has been committed by the defendant. Unless such a defendant is released sooner, such probable cause determination shall be made no later than forty-eight hours following defendant's arrest. Such determination shall be made in a nonadversary proceeding, which may be ex parte based on affidavits. If no such probable cause is found, the judicial authority shall release the defendant from custody.

OFFICER EISENSTEIN:  Good morning, Your

1    seminars related to narcotics surveillance and

2    organized crime and other activities such as that.

3         Q    Specifically, within the Stamford Police Force,

4    are you assigned to a certain unit, sir?

5         A    Yes, I am.

6         Q    What unit is that?

7         A    I'm assigned to the Narcotics and Organized Crime

8    Unit.

9         Q    How long have you been with them, sir?

10        A    Ten years.

11        Q    And what basically did you do as part of that

12   unit?

13        A    I'm an investigator.  My duties include but are

14   not limited to the investigation of narcotic

15   activity within the city of Stamford, Connecticut.

16        Q    You have been doing that for ten years?

17        A    Yes.

18        Q    Now, within your ten years there have you had the

19   occasion to work with informants, sir?

20        A    Yes.

21        Q    Basically, what is that interplay like, sir?

22        A    What we do is we have people that either we arrest

23   or people who come to us and offer their services as an

24   informant and what we do is we interview these people as to

25   what cases and information they have for us that they can

26   assist us in investigating, and then we explain to them how

27   we want them to either make buys, observe drug activity on

1    the streets or introduce undercover officers, things of that

2    nature.

3         Q    Are some informants deemed better than other

4    informants?

5         A    Yes.

6         Q    Why is that?

7         A    An informant's reliability and credibility is

8    determined by first of all the type of information he gives

9    and what we're able to corroborate and how many cases a

10   person has done.  The more cases they had where they're

11   proved to be reliable, the more reliable they are.

12        Q    And approximately how many different informants do

13   you work with, is there a set number?

14        A    Well, we have --   it varies from different times.

15   I may be working with as many as a dozen different

16   informants at a given time or maybe working with one or two,

17   just depends on what our circumstances are like at the

18   time.  But presently, I have approximately ten different

19   informants that I work with on a regular basis.

20        Q    You always act on information the informants give

21   you?

22        A    Well, what we do is we try to corroborate their

23   information and through our own investigation and wherever

24   that investigation leads us that's where we go that

25   determines how and how much we act.

26        Q    Let me direct your attention to Wednesday,

27   August 26, were you on duty?

A3

1       A       August 26, '98.

2       Q       1998, yes, sir.

3       A       Yes, I was.

4       Q       Were you with the Narcotics Division?

5       A       Yes.

6       Q       Now, did you receive a call from an informant that

7   day?

8       A       Yes, I did.

9       Q       What was the substance of that conversation?

10      A       The informant stated to me that there was a

11  vehicle parked in the parking lot of 186 Greenwich

12  Avenue, which is a one story facility owned and operated by

13  the city of Stamford considered to be public housing,

14  and it's primarily inhabited by senior citizens.  He said

15  that this vehicle was parked in the parking lot.  The

16  informant described the vehicle as being an old Cutlass,

17  color gray, two door with a blue vinyl roof with a

18  Connecticut plate on the back of the vehicle 679 "M" as in

19  Michael, "B" as in boy, "X" as in x-ray.

20      Q       Let's regress just briefly.  The informant that

21  contacted you had you worked with the informant in

22  the past?

23      A       Yes.

24      Q       You know the informant to be credible?

25      A       Yes.

26      Q       What are you basing that upon?

27      A       I have been working with this informant since 1990

1  and the informant had done --  recently he had been

2  reliable, proven reliable, on over ten occasions, over the

3  overall relationship that I have had with this informant.

4  This informant has been reliable approximately thirty times.

5       Q    If you could continue.  What other information did

6  the informant give you that day?

7       A    Stated inside this vehicle was an unspecific

8  quantity of crack cocaine and that the vehicle was being

9  operated by a black male, approximately 6 feet tall over 200

10 pounds, muscular build, beard and mustache, wearing a black

11 tee shirt, blue jeans and white sneakers.

12            THE COURT:   Could you stop a second because

13            I missed that.  Would you read it back?

14            (Whereupon, the reporter read back the last

15            answer.)

16            THE COURT:   Continue Mr. Couloute.

17 BY MR. COULOUTE:

18      Q    If you recall, did he give any other description

19 of the correct vehicle or occupants there if you

20 recall anything else?

21      A    No, the complete description of the male was

22 given, the complete description including the vehicle plate

23 was given, only other information relative to this was that

24 this male was in the company of a black female who the CI

25 referred to as Marlene.

26      Q    Now, do you know how the CI came in possession of

27 this information, sir?

```
 1      A    Yes.

 2      Q    Can you tell us, please.

 3      A    The CI had overheard a conversation between

 4   Marlene and the black male subject prior to them

 5   leaving the area to go get the quantity of crack.

 6      Q    After you received the information what did you

 7   do, sir?

 8      A    Myself, Officer Doug Robinson and Wayne Skitara,

 9   all members of my unit, went into the area of 186 Greenwich

10   Avenue and set up a surveillance of the parking lot.  We

11   observed the vehicle parked in the lot, backed into a

12   parking space on the property of 186 Greenwich Avenue and

13   from two different angles we surveyed the vehicle.

14      Q    Now, the vehicle that you're mentioning is the one

15   that the CI told you would be there?

16      A    Yes.

17      Q    Is there anything different about the actual --

18   or your actual observations of the vehicle that

19   was different from the CI?

20      A    No, everything was exactly the way the CI said

21   where it would be.

22      Q    What happened in the course of your surveillance?

23      A    During the course of surveillance I observed the

24   black male later identified by us as Emanuel Smith

25   approach the vehicle on the driver's side with

26   keys in his right hand, opened up the driver's

27   side door of the two door vehicle and leaned into
```

A6

1    the vehicle down on the floor near the driver's

2    side in the front.   He was there a few seconds,

3    rose back up, closed the door and locked the

4    vehicle.  At which time we approached Emanual

5    Smith and he began to run towards the area of

6    Polasky Street.

7        Q    When you say "leaned down in the vehicle" could

8    you be more --   could you be more descriptive if

9    you could?

10       A    He opened up the door of the car.

11       Q    Yes, sir.

12       A    He stepped between the door of the car and body of

13   the car and where the front steering wheel is,

14   front seat on the driver's side of the vehicle, he

15   leaned down from his waste and slightly bent his

16   knees and leaned down toward the floor, the

17   driver's side floor of the vehicle.

18       Q    Okay.   What happened after that, sir?

19       A    When we approached the subject he began to run

20   towards Polasky Street at which time Officer Skitari pursued

21   him on foot, myself and Officer Robinson pursued him in our

22   surveillance vehicle.  He attempted to go towards --   there

23   is a bridge which runs over the Rippawon River.  He

24   attempted to cross that bridge.  We cut him off with the

25   vehicle.  He made a right-hand turn and ran into --   there

26   is a very large construction yard there.  It's a cement    -

27   company 0 & G Cement Company.  He ran into the yard and he

A7

1    cut through some debris and wound up along a fenced in area

2    right near the river.

3        Q    Approximately how many feet away from the car was

4    the defendant when you finally apprehended him,

5    sir?

6        A    I would say approximately a hundred feet.

7        Q    What happened at that time?

8            THE COURT:    A hundred feet from what,

9    Mr. Couloute?

10            MR. COULOUTE:    From the actual vehicle.

11        From the vehicle.

12            THE COURT:    Thank you.

13    BY MR. COULOUTE:

14        Q    What happened at that time, sir?

15        A    We caught up with Emanuel Smith.  He fought with

16    us briefly.  We were able to wrestle him to the

17    ground and place him in handcuffs.

18        Q    What occurred next?

19        A    Officer Skitari took his --  the car keys which

20    were still in his right hand.  He gave them to me.  We all

21    walked back to the vehicle and I opened up the driver's side

22    door.  I leaned across the vehicle and opened up the

23    passenger side door to allow Officer Skitari to enter the

24    vehicle from the passenger side.  Officer Robinson remained

25    with the prisoner and called for a uniformed car to come

26    secure the prisoner.  I leaned down in the same area where

27    we had observed Emanuel Smith lean down in the vehicle on

1    the floor of the front passenger side.  I lifted up the

2    floor matt.  Underneath the floor matt was a celephane

3    wrapper from a cigarette pack and inside that was eleven

4    small yellow tinted plastic ziplock bags, which contained

5    what I know from my training and experience to resemble

6    crack cocaine.

7         Q    The drugs, narcotics were found on what side of

8    the car?

9         A    Yes, found underneath the driver's side floor matt

10   in front of the vehicle.

11        Q    Okay.   What happened next, sir?

12        A    We completed a search of the vehicle.  We found

13   two other items inside.  Officer Skitari found two items one

14   on the passenger seat which was a receipt with the name

15   Emanuel Smith.  On the inside of the glove box was a bank

16   book with his name on it and we then secured the vehicle,

17   our prisoner requested to go to the hospital for a small

18   laceration on his forehead and he said he was diabetic and

19   needed attention for that.  He said his blood sugar was

20   irregular.  We had him transported to the hospital by a

21   uniformed officer and he was then brought to headquarters,

22   booked and placed in a cell.

23        Q    Just two more questions, sir.   The physical

24   description given by the CI of the individual who

25   would be in possession of that car, was there

26   anything inaccurate about that description?

27        A    No, everything the CI stated to us it matched the

47

1    suspect exactly the way I described him.

2        Q    And at what point did you recognize this

3    individual, the individual that was at the car as

4    Emanuel Smith?

5        A    When he began to run --   When I observed and

6    recognized him as Emanuel Smith was when I cut him off on

7    Polasky Street because at that time he was in front of the

8    vehicle and that was the first real good look that I had

9    with him face to face.  Officer Skitari recognized him when

10   he was --   when he caught up with him in O & G property.

11       Q    How did you know Emanuel Smith?

12       A    I knew him from previous narcotics arrests.

13            MR. COULOUTE:  The state has no further

14            questions, Your Honor.

15            THE COURT:  All right.   Mr. Marantz?

16       CROSS-EXAMINATION OF OFFICER EISENSTEIN

17   BY MR. MARANTZ:

18       Q    Attorney Eisenstein, did you have a chance to

19   review your report before coming in today?

20       A    Yes.

21       Q    When was that?

22       A    When did I review the report?

23       Q    Yes.

24       A    Approximately between nine-thirty and ten o'clock.

25       Q    Okay.

26            THE COURT:   That's today, right?

27            OFFICER EISENSTEIN:  Yes.

48

1    BY MR. MARANTZ:

2         Q    Did you discuss your testimony with anyone today?

3         A    I didn't discuss my testimony with anyone, no.

4         Q    Now, was it you yourself who dealt with the

5    confidential informant directly?

6         A    Yes.

7         Q    Were you also designated as the team leader as far

8    as this arrest?  What is that the course of

9    practice?

10        A    Well, we don't --   in this particular case being

11   that we didn't have a supervisor present with us,

12   we don't have anybody that's designated as being

13   an actual team leader or supervisor.   We kind of

14   rule by committee.

15        Q    Okay.   You have explained that the CI was

16   reliable in the past, I heard your testimony.

17   What I'm curious to know, when was the very last

18   time you did use the CI?

19        A    Approximately I would say within two to three

20   weeks prior to this particular case we had used

21   him.

22        Q    And did that result in a successful arrest as

23   well?

24        A    Yes.

25        Q    Can you tell me in the case of a CI of this nature

26   is this a person whose been arrested by your department in

27   the past or is this a citizen forthcoming with information

49

1    for the police?

2                     MR. COULOUTE:    Objection.  Relevance.

3                     THE COURT:    Overruled.

4                     THE COURT:    You can answer the question.

5                     OFFICER EISENSTEIN:   This is a person whose

6                been arrested by the Stamford Police Department in

7                the past, yes.

8    BY MR. MARANTZ:

9         Q    Does he have anything pending at this point?

10        A    Yes, he does.

11        Q    Would I be correct in assuming that anybody who

12   wants to act as a CI there would be something in

13   it for him?

14                     MR. COULOUTE:    Objection.

15                     THE COURT:    That's obvious.  Sustained.

16                Those answers clearly answer that question.

17                Mr. Marantz, move along here to the veracity basis

18                of knowledge.

19   BY MR. MARANTZ:

20        Q    Do you know --   personally know whether the CI

21   may have had a grudge to hold against my client?

22        A    I can say that my CI did not know your client.

23        Q    He clearly --   he did know the passenger

24   Ms. Marlene Smith.   Do you know what his prior relationship

25   was with Ms. Smith?

26        A    Yes.

27        Q    Could you tell us?

A12

50

1    A    Their acquaintances by virtue of the fact that

2    they hang out in the same social circle.

3    Q    When the CI gave you this information regarding

4    Ms. Smith and Mr. Emanuel Smith together did he

5    indicate whether anybody else was in the car or

6    with the defendant at anytime?

7    A    The informant stated that the vehicle was being

8    driven by Emanuel --   by a black male subject that he

9    described that we later identified as Emanuel Smith and the

10   only other person in contact with the vehicle was Marlene

11   Smith.

12   Q    And throughout your observations of the vehicle

13   nobody else approached the car, is that correct?

14   A    That's correct.

15   Q    About how long did you conduct surveillance on the

16   vehicle before making --   before moving in on the

17   defendant?

18   A    Approximately fifteen minutes.

19   Q    And the first activity that you viewed was

20   Mr. Smith approaching the car?

21   A    That's the only activity.

22   Q    Now, the confidential informant had also stated to

23   you that Marlene had drugs, is that correct?

24   A    That's correct.

25   Q    Tell us a little more precisely what was

26   indicated?

27   A    It was indicated there was narcotics in the

A13

51

1    vehicle and that additional narcotics was in the

2    possession of Marlene Smith.

3        Q    Were any drugs ever recovered from Marlene Smith?

4        A    No.

5        Q    Now, do you know how the CI knew Marlene had drugs

6    on her person?

7        A    Yes.

8        Q    Would you tell us?

9        A    This was through the conversations that the CI

10    overheard between Marlene Smith and Emanuel Smith.

11        Q    Did --   do you know if the CI ever actually saw

12    any drugs on Marlene Smith or Emanuel B. Smith, Jr.?

13        A    I know that he did not see drugs in the vehicle

14    because the CI never approached the vehicle and the CI was

15    never in the vehicle.

16        Q    Do you know if he saw Marlene Smith handling any

17    drugs?

18        A    No.

19        Q    Do you know if the confidential informant in fact

20    sold the defendant any drugs?

21        A    The confidential informant does not sell drugs.

22        Q    How do you know that?

23        A    Because any drugs that would be in the possession

24    of the confidential informant would probably be

25    used by the confidencial informant, they're a drug

26    user not a drug dealer.

27        Q    So the confidential informant you had indicated

A14

56

1          OFFICER EISENSTEIN:  No, not at that

2          particular moment.

3    BY MR. MARANTZ:

4        Q    No reason at that point by his movements.  How did

5    you assess that?

6        A    He wouldn't have seen us because we were in

7    vehicles that he wouldn't have detected as police

8    vehicles.  We were not in police cars.

9        Q    Unmarked vehicles?

10       A    In unmarked vehicles.

11       Q    Also in plain clothes that day?

12       A    Yes.

13       Q    And when you apprehended Mr. Smith, did you find

14   any drugs whatsoever on his person?

15       A    No.

16       Q    Do you have an opinion as to what he might have

17   been doing reaching into the car and getting up

18   and getting out locking the door?

19       A    Do I have an opinion?

20       Q    Yes.

21       A    Well, I would say that there are a couple

22   different things he could have been doing.   One

23   of which would have been to check to see if the

24   drugs were still there.   Number two, to rearrange

25   their location in the vehicle or Number three, to

26   place them in the vehicle had he had them on his

27   person.

                          A19

1      Q    Did the CI advise you that there were drugs in the

2   car prior to it being parked in front of 186 Greenwich

3   Avenue?

4      A    The CI wording was that there is a vehicle parked

5   at this location.  The CI described the vehicle

6   and stated this, there was an unspecified amount

7   of crack cocaine inside the vehicle.

8      Q    And this was based on a conversation he overheard?

9      A    Yes.

10     Q    You know whose car?

11     A    Yes.

12     Q    Could you tell us?

13     A    The registered owner of the vehicle is Acordia

14   Andrea Dozier.

15     Q    When did you discover that information?

16     A    When we checked the registration of the vehicle.

17     Q    Was that during your surveillance?  Was that post

18   arrest?

19     A    We had run the license plate and during the

20   surveillance and then we had checked the

21   registration inside the vehicle when we searched

22   it.

23     Q    You said also that there was a surveillance of the

24   parking lot from two angles?

25     A    Yes.

26     Q    Could you just give us a brief rundown on how that

27   was set up?

54

1   one of the apartments and did not come out of the

2   apartment until after Emanuel Smith was

3   apprehended.  If she did, assuming she did have

4   narcotics in her possession at any time, according

5   to my informant she had ample opportunity to

6   dispose of any narcotics in her possession.

7        Q    You would be surprised at this point?

8        A    That would be speculation on my part.

9        Q    You know what apartment she went into?

10       A    I don't recall the number of the apartment that

11  she was in.  I do recall the location of the

12  apartment however.

13       Q    At no time did you ever search that apartment, is

14  that correct?

15       A    We did not have a reason, you know, no probable

16  cause, and we didn't have a warrant to search,

17  therefore, we didn't.

18       Q    Wasn't reason enough to your confidential --

19  wouldn't reason enough be in an attempt to corroborate the

20  confidential informant's information and in fact show that

21  he was reliable?

22       A    By doing what, searching the apartment?

23       Q    Yes.

24       A    No, because we had no probable cause to search the

25  apartment, and we had no warrant to search the apartment, so

26  how can we search the apartment.  Wouldn't be a legal

27  search.  My corroboration of information given by the

A17

1    informant, we had already corroborated the information.

2    Everything that the informant told us up to that point was

3    proven true.

4        Q    Well, how did you corroborate that information?

5        A    The information given to us was to describe the

6    vehicle we observed, the exact vehicle described to us, to

7    describe --   he described the subject.   We observed that

8    exact suspect as described.   The movement of the suspect

9    running from us upon observing us.   His actual apprehension

10   and search of the vehicle shows that everything that the CI

11   told us was true.

12       Q    And you also indicated that you saw the defendant

13   reach into the car and look under the seat, is

14   that correct?

15       A    What I said was that he opened up the door of the

16   vehicle and leaned down on the front driver's side of the

17   vehicle, down near where I searched, in that vicinity, the

18   front floor matt, that's where he appeared to be looking and

19   that's where he appeared to be reaching.   He made no

20   movement to reach under the seat as best that I could see.

21       Q    But at that point where he was reaching into the

22   vehicle and reaching down, do you think that he was aware

23   of the officer's presence?

24                MR. COULOUTE:   Objection.  Calls for

25           speculation.

26                THE COURT:   He can answer.  He already said,

27           no.  What was the rest?

A18

1    has cases pending.  Are those Possession of

2    Narcotics cases?

3         A    There is one Possession of Narcotics case.

4         Q    Does the confidential informant have Sale of

5    Narcotics cases pending?

6         A    Never.  Not now, not ever.

7         Q    The CI had stated that Marlene Smith had some

8    drugs on her person, is that correct?

9         A    Yes.

10        Q    Which officer conducted the search on Ms. Smith at

11   the scene?

12        A    We called a female uniformed officer to the scene

13   Jennifer Pinto.

14        Q    And in fact is it correct that she did not recover

15   any drugs from the person of Marlene Smith?

16        A    That's correct.

17        Q    So the confidential informant's information that

18   there were drugs on Marlene Smith's person was incorrect?

19              MR. COULOUTE:   Objection.   The issue

20              Officer.Eisenstein wouldn't know if there were any

21              drugs on Marlene Smith until there was a search.

22              We have to realize the officer chasing

23              Emanuel Smith at that time had plenty of

24              opportunity if she was watching Emanuel Smith

25              dispose of drugs in the house before they actually

26              went back to where Ms. Smith was.

27              Officer Eisenstein would be speculating at best to

1          say whether or not there were drugs on her person.
2          He answered the question at the time she was
3          searched there were no drugs on her person subject
4          to arrest of Mr. Smith.
5                    MR. MARANTZ:  I didn't hear any testimony
6          regarding Ms. Smith entering any house or loss
7          of --  losing sight of Ms. Smith.
8                    MR. COULOUTE:  Maybe the foundation should
9          be laid or asked where Ms. Smith was at the time.
10         We know she wasn't at the car.  Officer Eisenstein
11         said Emanuel Smith was the only one at the car.
12                   THE COURT:   I'll allow the question to be
13         answered and overrule the objection, Mr. Couloute.
14                   MR. COULOUTE:   Yes, sir.
15                   OFFICER EISENSTEIN:  Repeat the question.
16                   MR. MARANTZ:  Can the court reporter read
17         back the question?
18                   THE COURT:   Because if you didn't say it I
19         was going to say it.
20                   (Whereupon, the last question was read back
21         by the court reporter.)
22                   OFFICER EISENSTEIN:  No, that's not correct.
23         If I can elaborate?
24    BY MR. MARANTZ:
25         Q    Yes.
26         A    I'm saying my informant's information I believe to
27    be correct, okay, that Marlene Smith was inside

A16

58

1    A    Myself and Officer Robinson were in one
2    surveillance vehicle directly across the street
3    from 186 Greenwich Avenue.    We had a clear and unobstructed
4    view of the parking lot and suspect vehicle.
5    Officer Skitari was parked in the area to our right on a
6    small side street, which has also a clear and unobstructed
7    view of the parking lot and the vehicle as well.
8    Q    All the officers were in vehicles?
9    A    Yes.
10   Q    Officer Skitari left his vehicle to pursue the
11   defendant on foot?
12   A    No, he drove his vehicle into the parking lot and
13   then exited his vehicle and pursued the subject on
14   foot there into the parking lot at 186?
15   A    Yes.
16   Q    And do you -- Strike that.  You indicated that
17   the defendant ran approximately 100 feet from
18   where the car was parked, is that correct?
19   A    That's correct.
20   Q    Did you lose sight of him at anytime?
21   A    No.
22   Q    You discovered who the vehicle belonged to after
23   the search of the vehicle when you uncovered the
24   registration, is that what you're testifying?
25   A    When we ran the plate prior to.
26   Q    Ran the plate prior?
27   A    During the surveillance, then we again confirmed

A21

1    that by checking inside the vehicle and finding the

2    registration.

3        Q    Is the owner of the vehicle known to you?

4        A    Yes.

5        Q    Is the owner of the vehicle known to you as

6    someone involved in criminal activities?

7        A    Yes.

8        Q    What sort of criminal activities?

9        A    Assault and most recently this person is presently

10    incarcerated as a suspect in a hit and run homicide.

11        Q    Is the owner of the vehicle also known to you as

12    somebody involved in drug use?

13        A    No.

14        Q    So then what you're indicating, telling us today

15    is that you have never arrested the owner of the vehicle for

16    drugs?

17        A    That's correct.

18        Q    And you've never observed the owner of the vehicle

19    using drugs or selling drugs?

20        A    No because if I did, I would have arrested him.

21        Q    Well, don't officers sometimes make observations

22    without making arrests?

23            MR. COULOUTE:    Objection.  Relevance.

24            THE COURT:    Sustained.

25    BY MR. MARANTZ:

26        Q    At anytime in the recent past have you seen the -

27    owner of the vehicle operating that vehicle?

1      A     I have never seen the owner of that vehicle

2   operate that vehicle.

3      Q     So you yourself also did question Marlene Smith,

4   is that correct?

5      A     Yes.

6      Q     Did at anytime you ask her where she was going,

7   whether she lived at 186 Greenwich Avenue or anything

8   regarding the visit to 186 Greenwich Avenue?

9      A     Yes.

10      Q     What did she indicate?

11      A     She stated to me that she had seen Emanuel Smith

12   on West Main Street and asked him for a ride over

13   to 186 Greenwich Avenue, and he complied and gave her a ride

14   over to that address.

15      Q     She indicate why she was going there or where she

16   was going?

17      A     Visiting friends in an apartment.

18      Q     Did she indicate whether she was going to get back

19   into the car with Mr. Smith and go elsewhere?

20      A     No, she did not indicate that.

21      Q     Why was she excluded as a suspect in this case?

22          MR. COULOUTE:   Been asked and answered.

23          THE COURT:   I'll let him answer again.

24          OFFICER EISENSTEIN:   The information

25          regarding the vehicle involved Emanuel Smith, and

26          the drugs that were located inside the vehicle   .

27          were found in an area where we observed that he

61

1          had just been, and no drugs were found in the

2          possession of Marlene Smith.   So, therefore, she

3          was not arrested.

4     BY MR. MARANTZ:

5          Q    When you had set up the surveillance of the

6     vehicle for the fifteen minutes at anytime did you

7     observe any sales by the defendant?

8          A    No.

9          Q    Did you observe anything in his hands?

10         A    Yes.

11         Q    Referring to the keys?

12         A    Yes.

13         Q    But no bags?

14         A    No bags.

15         Q    You have testified that you were in plain clothes

16    and unmarked vehicles.  Did you announce, stop the police

17    when you saw Mr. Smith exit the vehicle?

18         A    When we began --   when we approached him

19    Officer Skitari got out of the car.  He immediately

20    recognized us as police officers and began to run.

21         Q    How do you know he recognized you as police

22    officers?

23         A    Because we have arrested him in the past.  He

24    knows who we are.  We're very recognizable people,

25    not undercover to the point nobody knows who we

26    are.  Probably the most recognized police officers

27    in the city of Stamford.

A24

62

1      Q    You have your badges displayed?

2      A    Yes.

3      Q    How were they displayed?

4      A    Mine was displayed by a chain around my neck,

5   displayed in front of my chest.

6      Q    So there were three officers who actually moved in

7   on Mr. Smith or was it just you and Officer Skitari?

8      A    Officer Skitari exited his vehicle and began foot

9   pursuit.  Myself and Officer Robinson pursued him in our

10   vehicle then got out on foot once he entered the 0 & G

11   property.

12     Q    Did anybody display any weapons?

13     A    No.

14     Q    Not the officer?

15     A    No.

16     Q    Not the defendant?

17     A    No.

18     Q    So it's your testimony that when Mr. Smith saw the

19   officer approaching him he did not stop, he

20   continued to leave the area?

21     A    Yes, he ran from us.

22     Q    And then you and Officer Skitari ran after him?

23              MR. COULOUTE:    Your Honor, excuse me at this

24              time, this is becoming quite repetitive.  He's

25              answered these questions for the third time.  The

26              answer is he drove his car to a point where he

27              parked his car, got on foot and chased the

63

1          individual down with the other officer.  It's been

2          asked and answered.

3                    MR. MARANTZ:    Question withdrawn, Your

4          Honor.

5     BY MR. MARANTZ:

6          Q     Was at the time of the pursuit, were the officers

7     saying anything at all to Mr. Smith?

8          A     When we were chasing him?

9          Q     Uh huh.

10         A     No, we were just chasing him.

11         Q     Was Mr. Smith at any point saying anything to the

12    officers?

13         A     Not while we were chasing him.

14         Q     And when you caught Mr. Smith?

15         Q     Did he have anything to say?

16         A     At the time when we were attempting to take him

17    into custody, no, he didn't have anything to say.

18         Q     You cuffed him in the concrete company's yard?

19         A     Yes.

20         Q     Was he standing?  At that point was he lying face

21    first down on the ground?

22         A     He was in the prone position on his stomach.

23         Q     And at that time did you place him under arrest?

24         A     Absolutely.

25         Q     And you patted him down?

26         A     Searched him.

27         Q     Searched.    And the only items recovered again

A26

72

as the veracity

and in the

roboration by the

prong and

police, then,

the probable

search the

Your Honor, that

CI alone and

on.    Mere

probable cause,

e of the

ation by the

sed on the

on't see

rge either.    I

back to this,

dismissed by the

you talking

Intent to Sell,

er the

ice ever

information    -

more than a

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

1     mere Possession of Narcotics case.  So I think the

2     real issue here, Your Honor, is whether the police

3     received additional information, which was not

4     indicated in the police report regarding whether

5     the CI saw that the defendant had drugs on him

6     with either intent to possess or intent to sell,

7     and I don't see that here, Your Honor, and I think

8     that this evidence must be suppressed.

9          THE COURT:  Anything else, Mr. Marantz?

10         MR. MARANTZ:  No, Your Honor.

11         THE COURT:  Mr. Couloute?

12         MR. COULOUTE:  No, sir.

13         THE COURT:  Sheriff, I'll take a fifteen

14     minute morning recess at this time.  I will have

15     an opportunity to review my notes and come out and

16     issue a ruling on the Motion to suppress.

17         THE SHERIFF:  All rise.  Court is now in a

18     fifteen minute recess.

19         (Off the record at 11:30 a.m. and back on the

20     record at 11:50 a.m.)

21         THE SHERIFF:  All rise.  Court is now

22     reconvened.  You may be seated.

23         THE COURT:  The court has had the

24     opportunity to review some of the authority relied

25     upon by the state as well as the defendant and

26     other authority not mentioned in argument by

27     counsel to the court with respect to suppression

74

1    of items that were seized on August 26, 1998.

2         The court finds that at the time of

3    August 26, 1998 the following facts occurred in

4    Stamford.   Officer larry Eisenstein, a veteran

5    member of the Stamford Police Department together

6    with some of his colleagues, received information

7    from a confidential informant.  Officer Eisenstein

8    was on duty, received a call from a confidential

9    informant who said a motor vehicle was parked at

10   186 Greenwich Avenue, a public housing residential

11   building.  He said that a car was in the lot

12   described as an Olds Cutlass, gray, with further

13   physical description of said Cutlass bearing

14   Connecticut Registration 679 MBX.  Officer

15   Eisenstein works with the confidential informant

16   since 1990 and recently and over ten occasions

17   received reliable information leading to the

18   successful arrest, seizure and convictions of

19   other defendants, and in excess of thirty since

20   1990.

21        The informant provided Officer Eisenstein

22   with information that the said motor vehicle

23   contained an unspecified quantity of contraband,

24   specifically crack cocaine inside of the motor

25   vehicle.   The confidential informant further

26   stated that the vehicle was operated by a black

27   male who was described as 6 feet, over 200 pounds,

1      who was in the company of a female known to the

2      confidential informant as Marlene.

3          The officer set up a surveillance following

4      the receipt of that information.   Upon arrival at

5      the location the officers' confirmed the

6      information provided by the confidential informant

7      with respect to the location and description of

8      the motor vehicle, and the presence of a black

9      male fitting the description.   The surveillance

10     was conducted for a period of about fifteen

11     minutes.   During which time no drugs were seen by

12     the police officer nor were any transactions

13     observed.

14         But the police officer did observe a black

15     male fitting the description later found and

16     identified as the defendant Mr. Smith,

17     Emanuel B. Jr., approaching the vehicle leaning

18     down from his waist to the driver's side of the

19     motor vehicle.

20         The police moved in and Mr. Smith fled on

21     foot, and he attempted to cross a bridge.   He was

22     apprehended approximately 100 feet from the

23     location of said motor vehicle.   The defendant

24     fought the police who identified themselves as

25     police officers with a badge plainly displayed

26     during the pursuit and during the resistance.

27     The defendant was wrestled down.   The keys were

76

1    taken from the defendant.

2       The confidential informant has prior arrests

3    for drug possession and in fact has a pending case

4    in the Stamford Judicial District.   The

5    confidential informant did not know the defendant

6    but did know his companion Marlene.   The

7    confidential informant never provided information

8    that he saw Marlene handle drugs nor did he say

9    the defendant handled drugs.   The confidential

10   informant never bought, purchased --   when I say

11   bought, purchased drugs from the defendant nor

12   Marlene, however, the confidential informant is in

13   fact known at least to Officer Eisenstein to be a

14   drug user.   When the defendant was apprehended,

15   no drugs were found on his person.   The police had

16   previously determined prior to moving in that the

17   car was registered to someone other than the

18   defendant and his companion.   Specifically a car

19   Acarde Andre Dozier.

20      The police officer determined that the

21   defendant was Emanuel B. Smith, Jr. after

22   apprehending him and seeing a pager and some cash.

23   The confidential informant never saw drugs being

24   placed in the motor vehicle.   The confidential

25   informant did not witness nor participate in the

26   crime.   At this time of the search and subject -

27   seizure the motor vehicle was unoccupied and

A41

by the defendant with keys in his possession. 77

1  locked∧  The defendant was not in the car.    There

2  were no plain view circumstances wherein

3  contraband was seen by the police officers∧nor  in the car

4  were there any existent circumstances at the time

5  of the search of the automobile.

6        Under both the federal and state constitution

7  the police must first obtain a warrant before

8  conducting a search unless an exception to the

9  warrant requirement applies.   I'm quoting from

10  Katz versus the United States, at 389 U.S. 347.

11  The warrant is required before every search or

12  seizure subject only to a few specifically

13  established and well delineated exceptions.

14        Quoting from the State of Connecticut versus

15  Longo found at 243 Connecticut 732, which further

16  quotes from the U.S. versus Rose case, 456 U.S.

17  798.    The scope of a warrant search of a

18  automobile is defined by the object of the search

19  and places in which there is probable cause to

20  believe that it may be found.

21        Quoting from Longo it is undisputed that in

22  that particular case occupants of a motor vehicle

23  and plural, occupants of a motor vehicle were

24  lawfully stopped, based upon traffic violations.

25  The probable cause to search the vehicle arose

26  when the police officer Pagonni smelled marijuana

27  and actually saw the marijuana seeds and

1    cigarettes in plan view inside of the car.  Here

2    the officers were searching for marijuana and

3    weapons.

4        Quoting <u>State versus Dukes</u>, which is 209

5    Connecticut '98, a police officer again stopped a

6    vehicle occupied by the defendant for a motor

7    vehicle violation determined that the license of

8    the operator --  defendant, had been suspended

9    and arrested him for that offense.  A search of

10   the defendant's clothing found a package of crack

11   cocaine in his jacket, which resulted in a search

12   of the vehicle for additional contraband.

13       Under the automobile exception, it permits a

14   warrantless search of an automobile whenever the

15   police have probable cause to do so.  Most of the

16   authorities cited for the search of an automobile

17   without a warrant referred to the defendant as

18   either a passenger or an operator and some

19   corroborating information by the police to

20   establish probable cause beyond information

21   provided by a confidential reliable informant.

22       In the <u>State versus Leonard</u> case, 14 Conn.

23   App. 134, which was affirmed by our Supreme Court

24   at 2210 Conn. 4890, the defendant was a passenger

25   in his own car.  The police officer noticed the

26   defendant as he appeared to be pushing something

27   under the front seat.  The police officer looked

A43

1  in and saw white powder on the driver's jacket and

2  mustache.    The white powder was in plain view.

3  The police officer had personal knowledge of his

4  training and experience that the white powder

5  could be contraband establishing, therefore,

6  probable cause to belief that the car contained

7  contraband and a warrantless search, therefore,

8  did not violate the defendant's federal or state

9  constitutional protection against unreasonable

10  searches and seizures.

11      In this instant case of State versus Smith

12  the basis of knowledge of the confidential

13  informant as well as his veracity not withstanding

14  the prior successful arrests resulting from

15  information provided by the said confidential

16  informant but particularly the basis of knowledge

17  of the confidential informant is at issue.

18      Here there were no exigent circumstances for

19  a warrantless search of the motor vehicle, which

20  as I stated was unoccupied and locked.    There was

21  no surveillance by the police prior to the search

22  to corroborate the confidential informant's

23  information that in fact drugs were contained

24  inside of the motor vehicle.

25      There was no evidence of any prior purchases

26  or controlled business buys to establish probable cause

27  to search the motor vehicle.    There was no plain

A44

80

1    view of the contraband in the closed motor

2    vehicle.   There was no contraband found on the

3    person of the defendant after a search incident to

4    his arrest for fleeing and physically resisting

5    the police.   There were no statements by the

6    confidential informant to the police implicating

7    the confidential informant as a potential

8    defendant subject to arrest for purchasing

9    contraband from either the defendant or his

10   companion Marlene Smith and/or involving the

11   storage of drugs in the motor vehicle.

12       The Smith case is clearly distinguishable

13   from the Velasko case which was a case I should

14   state it's 248 Conn. 183, March 30, 1999 decision.

15   Because in the Velasko case veracity and basis of

16   the confidential --   basis of knowledge of the

17   confidential informant were his personal

18   observations and his actual participation in the

19   purchase of drugs from the defendant and it was a

20   finding of probable cause to conduct a warrantless

21   search of a person as opposed to the motor

22   vehicle.   The court finds that the property was

23   illegally seized without a warrant under

24   circumstances requiring of a warrant.   After

25   considering the totality of the circumstances the

26   warrantless search of the defendant --  of the

27   motor vehicle not the defendant, motor vehicle --

1           but the motor vehicle and the subject seizure of

2           the items inside of the motor vehicle were seized

3           in violation of Article First, Section Seven of

4           the Connecticut Constitution and the Fourth and

5           Fourteenth Amendment to the United States

6           Constitution.   And the Motion to Suppress is

7           granted.   Items seized including the contraband,

8           any personal affects are supressed, ordered

9           supressed in this case.

10           MR. COULOUTE:   The state takes exception

11         and asks permission to appeal.

12           THE COURT:   Exception noted.

13           THE COURT:   Permission granted.

14           MR. COULOUTE:   Thank you.

15           THE COURT:   With that, Mr. Couloute, we have

16         a jury here.  We have as I recall two proceedings,

17         one of them involving a fourth count of

18         interfering with a police officer and the parallel

19         proceeding of violation of probation case.

20           MR. COULOUTE:   The state will not proceed on

21         the interfering count, sir, not in front of a

22         jury, sir.

23           THE COURT:   All right.  Well, you have a

24         Violation of Probation petition as well?

25           MR. COULOUTE:   Yes, sir.

26           THE COURT:   Are you prepared to proceed with

27         that?

1      MR. COULOUTE:  Not today, no, sir.

2      THE COURT:  What are you requesting?

3      MR. COULOUTE:  I'm requesting a day to have

4  the probation officer come in.  They were

5  scheduled to come in tomorrow.  We'll proceed

6  tomorrow.

7      THE COURT:  All right.  Did you wish to be

8  heard, Mr. Marantz?

9      MR. MARANTZ:  Your Honor, at this point we

10  are ready to proceed.  If the state is not ready

11  to proceed, we ask the matter be dismissed.

12      THE COURT:  I don't think the state said

13  it's not ready to proceed, I think that the state

14  said it was not going to prosecute the fourth

15  count.

16      MR. MARANTZ:  I ask the case be dismissed,

17  Your Honor.

18      THE COURT:  Mr. Couloute, are you entering a

19  nolle as to the fourth count, because if you are I

20  would assume that Mr. Marantz is going to object

21  and request that we proceed with the trial, is

22  that correct?

23      MR. MARANTZ:  Yes, sir.

24      MR. COULOUTE:  The state is entering a nolle

25  at this time, Your Honor.

26      THE COURT:  All right.  Nolle noted as to ·

27  the fourth count.  And the matter of the <u>State</u>

A47

1    versus Smith is continued one day at the state's

2    request in order to proceed with the Violation of

3    Probation Petition.  Madame Clerk, April 6.

4         MR. MARANTZ:   If I may just briefly be

5    heard, there was a Motion for Bond Reduction heard

6    by Judge Comerford, that Judge Comerford reserved

7    judgement on and determined that be heard before

8    the trial court.  We have not proceeded with that

9    motion.  I understand that the defendant has got a

10   $50 bond regarding the Violation of Probation,

11   however, he's held on a $100,000 bond regarding

12   this case.  In light of the court's ruling --

13        THE COURT:   You're putting the state on

14   notice you want to argue bond tomorrow.  The

15   state's entitled to notice.  I'll here you on that

16   request and make it in writing tomorrow when I

17   proceed with -- when the state proceeds and I

18   hear the Violation of Probation Petition.  All

19   right.

20        MR. MARANTZ:   Thank you, Your Honor.

21        THE COURT:   The matter is continued one day.

22   Court stands in recess.

23        THE SHERIFF:   All rise.  Court stands in

24   recess.

25        (Whereupon, the above case recessed at 12:06

26   p.m. to reconvene the following morning at

27   10:00 a.m.)

**TRANSCRIPT EXCERPT: T8-27-98 (PAGE 1) FINDING OF PROBABLE CAUSE AT ARRAIGNMENT**

1     MR. WEISS: Emanuel Smith---line sixteen.  He was

2 arrested without a warrant, charged with possession of

3 narcotics, possession with intent to sell, possession within ten

4 to fifteen hundred feet of a school or housing project.

5     THE COURT: All right, Emanuel Smith, there's

6 probable cause.

**TRANSCRIPT EXCERPT: T4-159 DEFENSE COUNSEL'S MENTION OF
TERRY V. OHIO**

19

1      circumstances because the police could have
2      arrested the defendant very possibly at least from
3      their perspective for interferring, resisting
4      arrest.  They could have transported him to
5      headquarters.  They could have got a warrant or
6      even stayed by the car while a warrant was
7      obtained.  This was an investigative <u>Terry versus</u>
8      <u>Ohio</u> stop.  No contraband was recovered from the
9      defendant or from his alleged cohort.  And this
10     other party who was alleged by the confidential
11     informant to be a passenger in Mr. Smith's car was
12     not arrested and no contraband was recovered from
13     her when she was searched by the officers.  It's
14     not an inventory search and <u>Janewsky</u> it was an
15     automobile search.

16        But what happened there, Your Honor, was the
17     police observed the defendant basically sliver out
18     of his vehicle on the floor upon seeing the
19     officers.  If there is probable cause to search
20     an automobile because of the fact that an
21     automobile is inherently mobile and not owned or
22     registered to this defendant, then, Your Honor,
23     there may be reason because the car could be moved
24     and the content could be lost to search the
25     vehicle without a warrant; but in the <u>Janewsky</u>
26     case what happened was the defendant made
27     absolutely inculpatory statements, voluntary

①

Background of case - nature of proceedings ; I (Emmanuel Smith) was arrested without a warrant on August 26, 1998, and charged with possession of narcotics, in violation of C.G.S. section 21a-279(a); possession of narcotics with intent to sell C.G.S. section 21a-278(a), Possession of narcotics within 1500 ft. of housing project, C.G.S. section 21a-278a(b), and interfering with a police officer, C.G.S. section 53a-167a, a class A misdemeanor. On August 27, 1998 the court (Judge Tobin ) found probable cause as to the three narcotics charges, and I (Emmanuel Smith) entered pleas of not guilty and elected to pretrial, trial by jury. T 8/27/98 - 01; I (Emmanuel Smith) moved to suppress evidence and to dismiss all charges against me in norwalk court G.A. 20. On April 6, 1999 a hearing was held on those motions before the court (Judge Rodriguez ). On that date, the court ordered the seized items suppressed and the state entered a nolle prosequi as to the interfering charge (note there was never any probable cause found for this charge 53a-167a). On April 7, 1999 the motion to dismiss was granted on all charges. The state was granted permission to appeal on April 7, 1999, and on April 21, 1999 it filed its appeal. the supreme court transferred the matter to itself on February 24, 2000, (note I had a lawsuit going on for the wrongful acts I was subjected to).

   Statement of facts; This case involves the warrantless search of a car, I (Emmanuel Smith) was not arrested at the scene of the car, but rather within a fenced construction yard 100 feet away, After my arrest for the misdemeanor of interfering the police picked up keys in parking lot were the car was parked, and said they seized the car keys from me, removed me from the fen-

ced york and transported me in handcuffs to the scene of the car, which they then unlocked and searched. One witness, Officer Larry Eisenstein of the Stamford police department, testified at the suppression hearing. The facts recited here are derived from his testimony, police report, arraignment transcripts, and transcripts from 4-6-99.

Officer Eisenstein had been a policeman for 20 years, and had been assigned to the Narcotics and Organized Crime Unit for 10 years. T38-39. At the time of his testimony, he worked with approximately ten informants on regular basis. T39-40.

On August 26, 1998 Eisenstein received a call from a confidential informant with whom he had worked since 1990; Eisenstein considered him to have been reliable approximately 30 times. T41-42. This informant had himself been arrested and had a possession of narcotics case pending, but Eisenstein considered him to be credible. T41, 49, 52. The informant had been used two or three weeks prior to this case, resulting in a arrest. T48.

The informant told Eisenstein there was an old gray cutlass, two door, blue vinyl roof, CT plate 679 MBK, parked in the public housing lot at 186 Greenwich Ave. T41. The informant claimed that inside the car was an "unspecific" amount of crack cocaine, and that the car was being operated by a black male, approximately 6 feet tall, over 200 pounds, muscular build, beard and mustache, wearing a black tee shirt, blue jeans and white sneakers. T42, 57. The man was in the company of a black female referred to as Marlene, who was a passenger in the car. T42, 65.

The informant did not know the man but claimed to know Marlene because they socialized in the same circle. T49-50.

The informant claimed to have overheard a conversation between marlene and the man before they left to get drugs, and claimed to know that Marlene had drugs on her person. T43,51,57. The information the informant gave police was that the two had just arrived at the location and that the drugs were in the vehicle. T65. Note in the police report this alleged c/i never said that he over heard a conversation between marlene and me nor did the c/i say that we left and came back with drugs. Police report off cected. The informant never actually saw any drugs, never approached the car and was never in the car, and never saw any drugs being placed in the car. T51,65. Officer Larry Eisenstein testified that he did not know if the informant ever saw Marlene handling any drugs. T51. Note in the police report it's precisely expressed; clear and specific — that the c/i further stated that the female, "marlene" was in possession of an additional amount of crack cocaine which she now held in her right front pants pocket. Based upon the conversation the informant claimed to have overheard, Eisenstein and two additional police officers set up a surveillance of the parking lot. T43. They were in plain clothes and two unmarked police cars. T56,58. A car matching the description given to them was in a parking space, and they watched it from two angles. T43. Everything about the car description was as the informant said it would be. T43. They ran the car's license plate and learned that it was registered to someone named Acordia Dozier, whom Eisenstein knew. T57,59. Dozier had been involved in assault and was incarcerated as a suspect of a hit and run homicide; but had never been observed in connection with drugs. T59.

The three policemen watched the car and after fifteen —

Lie under oath too the court